# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

CAMARA SANKOFA and
SHANELLE THOMAS,

               Plaintiffs,            Case No.

                                          Hon.

v.

MATTHEW ROSE, in his individual         **COMPLAINT**
capacity, RICHARD BIRMINGHAM in
his individual capacity, ADAM KUSCH,   **DEMAND FOR JURY TRIAL**
in his individual capacity, and
JOSEPH GASPER, in his official
capacity as the Director of the
Michigan State Police,

               Defendants.

_____/

Mark P. Fancher (P56223)         Nakisha N. Chaney (P65066)
Daniel S. Korobkin (P72842)       Cooperating Attorney,
American Civil Liberties Union     American Civil Liberties Union
  Fund of Michigan                Fund of Michigan
2966 Woodward Ave.           Salvatore Prescott Porter & Porter
Detroit, MI 48201              105 E. Main St.
(313) 578-6822                Northville, MI 48167
*Counsel for Plaintiffs*        (248) 679-8711
                                chaney@sppplaw.com
                                *Counsel for Plaintiffs*

_____/

## COMPLAINT

Plaintiffs bring this action against the defendant Michigan State Police employees for violations of the U.S. Constitution's Fourth and Fourteenth Amendments.  This action arises from Defendants' unlawful search and seizure, and deprivation of equal protection.

## INTRODUCTION

1.    On August 15, 2019, Plaintiffs Camara Sankofa and Shanelle Thomas, both African American, were profiled because of their race and unlawfully stopped, and falsely accused of running a red light. Although the law required that they be detained no longer than required to issue a ticket, they were detained for nearly two hours by multiple Michigan State Police (MSP) troopers, who unsuccessfully attempted to find a crime for which they could charge Plaintiffs.

2.    Although Plaintiffs Sankofa and Thomas were both educators at the time, returning home after a day of work, MSP troopers, consistent with racial stereotypes, presumed Plaintiffs possessed narcotics, asked them whether they had drugs in their possession, subjected them to searches both by troopers and K-9s, and engaged them in protracted irrelevant chatter as Plaintiffs endured public humiliation.  Plaintiffs' experience with MSP is all too common for African American drivers.

2

3.   MSP's own recent reports reveal that while MSP traffic stops decreased overall between 2017 and 2019, MSP stops for African Americans increased year after year during the same period.

4.   Also, while African Americans make up only 14% of the state's population, they accounted for 17% of all traffic stops in 2017, 19% of traffic stops in 2018, and 20% of traffic stops in 2019.

5.   Notably, racially-motivated vehicular stops are not innocuous encounters. Rather, they are unconstitutional seizures that increase the potential for confrontation, police violence, fatality, unlawful arrest, and compounding constitutional violations.

6.   As articulated in the special report *Driving While Black: Racial Profiling on Our Nations' Highways*, "Race-based traffic stops turn one of the most ordinary and quintessentially American activities into an experience fraught with danger and risk for people of color."[1]

7.   Such fear and danger are fueled by pervasive reports of unlawful police brutality suffered by African Americans in police encounters, such as the murder of George Floyd, the shooting death of Philando Castile during a traffic stop, the death

---

[1] DAVID A. HARRIS, ACLU, DRIVING WHILE BLACK, RACIAL PROFILING ON OUR NATION'S HIGHWAYS, AMERICAN CIVIL LIBERTIES UNION (1999), *available at* https://www.aclu.org/report/driving-while-black-racial-profiling-our-nations-highways.

of Eric Garner in a police chokehold, and the November 2020 mauling in which a Michigan State Police trooper unleashed his K-9 on a non-resisting Black man, allowing the dog to maul the man for four minutes before calling him off.

8.   Against this backdrop, MSP has consistently refused requests that it engage professionals who can identify policies and practices that cause discrimination and prescribe remedies for these problems.

9.   Through this lawsuit, Plaintiffs seek vindication of their rights, compensation for their mistreatment, and a path to systemic reform so that they and other African Americans in Michigan will no longer have to endure what they experienced.

## JURISDICTION

10. Plaintiffs bring this suit pursuant to the Fourth and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. §§ 1983 and 1988.  Plaintiffs seek injunctive, declaratory and other relief under 28 U.S.C. §§ 2201 and 2202.

11. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question), 1343 (original jurisdiction over civil rights claims) and 2201 (declaratory relief).

## VENUE

12. Venue is proper under 28 U.S.C. §1391(b)(1) and (2), this being a judicial district where the events giving rise to this action occurred.

4

## **PARTIES**

13.  Plaintiff CAMARA SANKOFA was a resident of Oak Park, Michigan, at all times relevant to the subject of this action. He currently resides in Detroit, Michigan. He is an educator by profession.

14.  Plaintiff SHANELLE THOMAS was a resident of Macomb, Michigan at all times relevant to the subject of this action. She currently resides in Detroit, Michigan. She is currently employed in the human services field and she is enrolled as a graduate student.

15.  Defendant MATTHEW ROSE was at all relevant times an MSP employee and agent. He is sued in his individual capacity.

16.  Defendant RICHARD BIRMINGHAM was at all relevant times an MSP employee and agent. He is sued in his individual capacity.

17.  Defendant ADAM KUSCH was at all relevant times an MSP employee and agent. He is sued in his individual capacity.

18.  Defendant JOSEPH GASPER is Director of the Michigan State Police. He is sued in his official capacity.

19.   Defendants at all relevant times acted or are acting under color of state law.

## **FACTS**

20.   On August 15, 2019, at or about 3:20 p.m., Plaintiffs traveled east on 8 Mile Road at the intersection of Southfield Road and 8 Mile Road in Oak Park, Michigan. Plaintiff Sankofa operated the vehicle, which was owned by Plaintiff Thomas.

21.   Plaintiffs stopped at the intersection in compliance with a red traffic signal. Because of an extended wait at the intersection, Plaintiffs exchanged comments about the delay.

22.   When the signal turned green, Plaintiffs resumed their travel.

23.   Thereafter, Plaintiffs were to have encounters with Defendants Rose, Birmingham, and Kusch, all MSP troopers. Plaintiffs were unacquainted with Defendants by name at the time of these encounters, and allegations of specific conduct of each Defendant will be specified by amendment to this Complaint when the identities of the Defendant troopers are obtained by Plaintiffs. For purposes of this Complaint, the Defendant troopers will be referred to as Defendant A, Defendant B, and Defendant C.

24.   At the time Plaintiffs passed through the intersection, "Defendant A" was stationary in the left turn lane of eastbound 8 Mile Road at Coolidge.

25.   Plaintiffs made a lawful U-turn and then turned right on to Coolidge heading north. Defendant A fell in behind them, activating his emergency lights after

6

he made the turn. Plaintiff Sankofa and Defendant A made eye contact by way of Plaintiffs' left rearview mirror during the U-turn, and Defendant A observed Plaintiff Sankofa's racial identity and African headwear, specifically a kufi hat.

26.   A kufi is a small hat usually worn by males of varying religions in Africa and a part of the traditional dress in many African countries. The kufi is often worn by African American men as a mark of cultural pride, to demonstrate their connection to their African heritage or for religious purposes.

27.   Defendant A caused Plaintiffs' vehicle to pull over and stop. As Defendant A exited his car and approached Plaintiffs' vehicle, he stated: "nice hat," while gesturing toward the white kufi that Plaintiff Sankofa wore.

28.   Defendant A requested Plaintiff Sankofa's operator's license, but he did not ask for his other documents, such as registration and proof of insurance, evidencing that Defendant A did not stop Plaintiff for a traffic or vehicle violation but for some other purpose.

29.   Defendant A stated: "You know you ran a red light back there. They called me and stuff."

30.   Defendant A returned to his vehicle.

31.   Plaintiffs, who were not free to leave, were compelled to remain at the scene.

32.   Plaintiffs were held at the scene for approximately 40 minutes before Defendant A informed them that there was a computer malfunction and it was necessary to wait for another trooper's car to arrive. Other troopers began to arrive about 15 minutes later, including a K-9 unit. The arrival of a K-9 unit and Defendants' subsequent actions indicate that Plaintiffs' detention was not delayed because of a computer malfunction as they were told but rather to allow the arrival of police back-up and a search dog.

33.   After additional troopers arrived Defendant A directed Plaintiff Sankofa to exit the vehicle.

34.   Defendant A patted Sankofa down and escorted him to the back of the car. Defendant A asked Sankofa where he was coming from and where he was going. Plaintiff Sankofa responded that he left the school where he worked as a teacher, and that he was returning to his home in Oak Park. Defendant A then asked Sankofa whether there were any drugs in the car. Plaintiff Sankofa asserted strongly and truthfully that there were no drugs and he explained that neither he nor Plaintiff Thomas had any involvement in drugs whatsoever.

35.   Defendant A retorted, "We'll see," evidencing an intention to go fishing for drugs despite the complete absence of cause, evidence or indication that drugs were present.

36.   Defendant B requested permission to conduct a K-9 search of the vehicle for drugs. Plaintiff Sankofa responded that it was not his vehicle and he did not have permission to authorize a search.

37.   Defendant B questioned Plaintiff Thomas about where they were coming from, where they were going and whether she would consent to a vehicle search. Plaintiff Thomas answered the questions and declined consent to search.

38.   Defendants directed Plaintiff Thomas to exit the car so that the troopers could conduct an external vehicle search using a canine.  As the canine on the scene had limited search capability, Defendants detained Plaintiffs for approximately 20 additional minutes until a second K-9 unit arrived.

39.   When the dog arrived, under the control of Defendant C - he walked around the vehicle and jumped up on it scratching at the paint. At one point the dog jumped up on the car and poked his head through an open window. Eventually the dog sat down near a rear passenger door. Defendants claimed that was an indication of the presence of drugs, and they began to open the car doors and search the interior of the vehicle. They opened and searched Plaintiff Thomas' purse and other containers. They threw personal items out of the car and ultimately determined that the vehicle contained no narcotics.

40.   Defendants neither arrested Plaintiffs nor issued them citations. Plaintiffs were detained for a total of approximately 118 minutes. During the detention,

Defendants interrogated Plaintiffs about a wide range of topics, many having no relevance to the stop.

41.  The racial targeting of Plaintiffs did not occur in a vacuum and it was not an isolated, unique event. Prior to the stop of Plaintiffs, the Michigan State Police had in its possession data that suggests that between the dates August 1, 2019 and August 14, 2019, leading up to August 15, 2019 (the date that Plaintiffs were stopped) the traffic stops made by Defendant Kusch reflected gross racial disparity, with the trooper having consistently stopped Black drivers to the exclusion of most other drivers of other races.

42.  In addition, Michigan State Police had received information and expressions of concern about suspected unconstitutional racial profiling by Michigan State Police personnel from the ACLU of Michigan and others. Concerns about racial profiling were expressed by the ACLU of Michigan to the MSP director in a memorandum dated March 5, 2019. An extended excerpt follows:

> The ACLU of Michigan received separate complaints from African American motorists who believe their race was the sole reason they were stopped by Michigan State Police while traveling on Interstate 94. Though these persons are unrelated and unacquainted, the experiences of two motorists are remarkably similar. These drivers were not only stopped by members of MSP's 5th District Home Town Security Team on separate Fridays during Autumn, 2016, but the purported reason for the stops is that they were both allegedly following too closely behind tractor-trailers. They were not accused of offenses that require arrest. Nevertheless, they were both asked to exit their vehicles. Their vehicles were searched and they were asked whether they were transporting

10

drugs or other contraband. In both cases a canine officer was called, and a dog sniffed the vehicles.

The ACLU of Michigan submitted a Freedom of Information Act request for documents related to stops made by the troopers who stopped the two referenced drivers. The records show that from Tuesday, Nov. 15, 2016 through Thursday, Nov. 17, 2016, one of the troopers made stops that brought him into contact with 15 individuals who were either drivers or passengers. Seven of these 15 individuals were identified as black, and four were identified as Hispanic. The race of one driver was not identified. The three remaining individuals were identified as white. The encounter with one of the white drivers was apparently not because of actual or suspected violations of the law, but for the purpose of providing assistance with the driver's vehicle.

In response to our concerns, MSP acknowledged there were, at that time, no reliable or consistent records of the racial identities of persons who were stopped. This prompted a new policy of mandatory reporting of racial identity that was implemented in January 2017. The ACLU of Michigan followed up with Freedom of Information Act requests for records of stops made by other members of the Fifth District Hometown Security Team on six randomly selected Fridays during the first quarter of 2017. The records produced by MSP show that on those days, four of the more active members of that unit made stops that brought them into contact with 82 individuals who were either drivers or passengers. Almost 48 percent of these individuals were identified by the troopers as black, Hispanic or Asian. About 24 percent of these individuals were identified as white. Another 28 percent were reported to be of unknown racial identity. There was special concern about these records, not only because they document racial disproportion, but also because seventeen of the 23 racially unidentified persons have Spanish surnames. In addition the "unknown" designation appears to give troopers attempting to disguise racial profiling the means to obfuscate racial stop patterns notwithstanding the MSP policy on racial reporting.

To obtain even more information about the troopers, a follow-up FOIA request was made for records that reflect the racial identities of all persons who were the subjects of traffic stops made by members of the 5th District Hometown Security Team on the following dates: January 6, 2017; January 20, 2017; February 3, 2017; February 17, 2017; March 3, 2017; March 17, 2017; March 31, 2017; April 7, 2017; April 14,

2017; April 21, 2017; April 28, 2017; May 5, 2017; May 12, 2017; May 19, 2017; May 26, 2017; June 2, 2017; June 9, 2017; June 16, 2017; June 23, 2017; June 30, 2017; and July 7, 2017. The records show that while all of the racial categories were used as identifiers to some degree, there was a distinct tendency by seven of the 10 troopers to racially classify drivers as either "black" or "white" to the exclusion of other racial identifiers.

Records of stops made by each of the troopers from the 5th District Hometown Security Team betray racial disproportion in traffic stops[2] and a considerable number of drivers who were not identified by race.[3]

43.   Michigan State Police conducted its own statistical analysis of traffic stop data and published the following findings:

"In August 2020, during a review of traffic stop data from 2017 – 2019, it was noted that the percentage of African American drivers being stopped has increased from 17.36 percent in 2017 to 20.54 percent in 2019. The increasing

---

[2] Trooper A: 10 whites; 3 blacks; 0 Hispanics; 0 Asians; 2 race unknown. Trooper B: 18 whites; 9 blacks; 0 Hispanics; 1 Asian; 6 race unknown. Trooper C: 14 whites; 6 blacks; 6 Hispanics; 0 Asians; 2 race unknown. Trooper D: 11 whites; 4 blacks; 0 Hispanics; 1 Asian; 3 race unknown. Trooper E: 7 whites; 5 blacks; 0 Hispanics; 0 Asians; 4 race unknown. Trooper F: 9 whites; 5 blacks; 2 Hispanics; 2 Asians; 3 race unknown. Trooper G: 61 whites; 11 blacks; 0 Hispanics; 1 Asian; 7 race unknown. Trooper H: 40 whites; 11 blacks; 0 Hispanics; 1 Asian; 0 race unknown. Trooper I: 43 whites; 12 blacks; 8 Hispanics; 0 Asians; 3 race unknown. Trooper J: 27 whites; 20 blacks; 0 Hispanics; 1 Asian; 15 race unknown. (Troopers referenced in this footnote are not the troopers who are defendants in this lawsuit.)

[3] The surnames of persons whose racial identity was not specified are: Dwarakanatha, Jaber,, Salazar, Gharbavi, Ortega, Adan, Thalanki, Sanabria, Mosquera-Madrid, Velu, Morris, Antonio, Kurian, Barrios Y Barrios, Balasupramaniyan, Patel, Lopez, Serratos, Romero-Colon, Amanuel, Guerrero, Menendez, Siong, Zakieh, Faqihi, Shah, Zuniga, Al Dawood, Faulk, Denha, Arnall, Singh, Espinoza, Munoz, Theandon, Souidan, Al Saif, Aldabet, Gagnon, Alobaidi, Dykas

number of traffic stops involving African American drivers is noteworthy and merits a more in-depth review to ensure that department policies and practices are not resulting in the disparate treatment of some motorists.

**MSP Statewide Traffic Stop Data by Race of Driver: 2017 – 2019**

| Race and Hispanic Origin | 2017 | | | 2018 | | | 2019 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Traffic Stops | Traffic Stop % | MI Census Pop. % | Traffic Stops | Traffic Stop % | MI Census Pop. % | Traffic Stops | Traffic Stop % | MI Census Pop. % |
| American Indian and Alaskan Native | 1,378 | 0.31% | 0.50% | 1,254 | 0.29% | 0.50% | 1,144 | 0.28% | 0.70% |
| Asian | 3,502 | 0.79% | 3.1% | 3,457 | 0.79% | 3.20% | 3,031 | 0.74% | 3.40% |
| Black or African American | 76,924 | 17.36% | 13.60% | 82,600 | 18.88% | 13.60% | 84,283 | 20.54% | 14.10% |
| Hispanic or Latino | 8,614 | 1.94% | 5.10% | 9,843 | 2.25% | 5.20% | 9,120 | 2.22% | 5.30% |
| White | 328,268 | 74.08% | 75% | 325,630 | 74.43% | 74.80% | 300,895 | 73.34% | 74.70% |
| Unknown | 24,430 | 5.51% | 0% | 14,693 | 3.36% | 0.00% | 11,796 | 2.88% | 0.00% |
| Total | 443,116 | 100% | 97.3%* | 437,477 | 100% | 97.3%* | 410,269 | 100% | 98.2%* |

44.    Plaintiffs in this case were stopped on the border of Oakland County and Wayne County. Records show that in 2019, Black people made up 38.7% of the population of Wayne County, but 56.23% of the drivers stopped in Wayne County were Black. In Oakland County, 13.9% of the population is Black, but 34.91% of the drivers stopped there during 2019 were Black.

45.    The ACLU's observations and MSP's own findings are consistent with other evidence of the agency's practice of racial profiling. The ACLU of Michigan recently published: "The Border's Long Shadow: How Border Patrol Uses Racial Profiling and Local and State Police to Target and Instill Fear in Michigan's Immigrant Communities."

46.    The report states:

The data strongly suggests that federal law enforcement agencies involved in immigration enforcement routinely engage in racial

13

profiling. Similarly, when local, county or state police initiate arrests, Border Patrol's own records document questionable traffic stops, as well as the casual and commonplace prolonging of other routine interactions, including with victims of crime and witnesses, solely to allow a Border Patrol agent to arrive and initiate an immigration investigation — thereby illegally extending a person's detention. This report also reveals, for the first time, how deeply intertwined Michigan state, county and local law enforcement agencies are with Border Patrol, how this entanglement both encourages racial profiling and causes immigrant communities to distrust the police and how much time and how many resources these state, county and local law enforcement agencies are diverting away from the needs of the communities they serve.

47.  The report further states: "Michigan State Police is by far the law enforcement agency responsible for initiating the detention of the most people who are transferred into Border Patrol custody…"

48.  Prior to Plaintiffs' experience set forth in this Complaint, the ACLU of Michigan made multiple requests that the Michigan State Police engage an independent expert to perform an investigation and analysis of the agency to determine whether its employees were engaging in racial profiling, and whether remedial action was required.

49.  Upon information and belief, the agency was not evaluated by an independent expert prior to Plaintiffs' encounter with Defendants, nor were meaningful steps taken to correct any racial profiling practices by the agency's personnel. Furthermore, even the announced plan by MSP to obtain expert assistance does not include a plan to seek review of the agency's policies and practices to

14

determine whether troopers are engaged in racial profiling; and if so, the remedial measures that will be required to eliminate that practice. This is of special importance because of policies and practices of the agency that are likely to motivate troopers to engage in racial profiling, including its performance evaluation procedures, which incentivizes unlawful or arbitrary vehicle stops of people who may be (or be perceived as) less likely to complain, have fewer resources to contest, and/or who may be less likely to be believed or taken seriously in order for troopers to remedy their deficient stop records or meet performance expectations.

50.   Here, Plaintiffs did nothing other than drive while Black. For that, they were stopped, interrogated, held in police custody for nearly two hours at a scene with multiple police officers, several cruisers and two K-9 units present, detained as though they were criminals and subjected to the gaze of passing drivers.

51.   As a result of Defendants' actions, Plaintiffs suffered fear, emotional distress, humiliation, anguish, and damage to their vehicle.

52.   As a result of MSP's failure to end its practice of racial profiling, Plaintiffs continue to suffer fear, emotional distress, humiliation, and anguish from the knowledge that, despite complying with the law, they are more likely if not certain to be stopped, searched, and detained again by troopers because of their race.

## COUNT I

### FIRST CLAIM FOR RELIEF AGAINST DEFENDANTS ROSE, BIRMINGHAM AND KUSCH

(42 U.S.C. § 1983 Violation of the Fourth and Fourteenth Amendments
Unlawful Search and Seizure)

53.   Plaintiffs incorporate here all previously stated allegations.

54.   Defendants lacked any probable cause to believe Plaintiffs committed a traffic violation and there was no basis for a traffic stop.

55.   Defendants lacked any reasonable suspicion that Plaintiffs were engaged in or were about to become engaged in the commission of a felony or misdemeanor and there was no basis for a traffic stop.

56.   Defendants did not issue Plaintiffs a warning or citation, and no arrests were made. The detention of Plaintiffs for any period of time was not reasonably required and was therefore unlawful.

57.   Under the totality of the circumstances the duration of the stop of Plaintiffs was unreasonable.

58.   The use of a K-9 to conduct an external search of Plaintiffs' vehicle was not reasonably required, was unlawful, and unreasonably prolonged the stop when Defendants lacked an independent, reasonable suspicion to extend the stop.

59.   The detention of Plaintiffs, along with the unwarranted search of Plaintiffs' automobile, were unreasonable under the prevailing circumstances and

thus violated the Plaintiffs' right not to be subjected to unreasonable search and seizure guaranteed by the Fourth Amendment of the United States Constitution.

60.   At all times relevant Defendants acted under color of law when they unlawfully and unreasonably seized Plaintiffs, subjected them to an unreasonable delayed detention and searched Plaintiffs' automobile in violation of their rights under the Fourth Amendment as applied to the states by the Fourteenth Amendment to be free from unreasonable searches and seizures.

61.   As a direct and proximate result of Defendants' wrongful acts, Plaintiffs suffered economic damage, emotional injury, embarrassment, and humiliation.

## COUNT II

### SECOND CLAIM FOR RELIEF AGAINST DEFENDANTS ROSE, BIRMINGHAM AND KUSCH
(42 U.S.C. § 1983 Violation of the Fourteenth Amendment
Equal Protection)

62.   Plaintiffs incorporate here all previously stated allegations.

63.   A traffic stop by a law enforcement officer must be based on observed conduct that gives the officer probable cause to believe there has been a violation of a traffic law or regulation; or reasonable suspicion to believe other criminal activity is afoot.

64.   Plaintiffs neither violated laws nor engaged in conduct giving rise to reasonable suspicion or probable cause at the time they were stopped by Defendants.

17

Case 4:21-cv-11468-MFL-EAS   ECF No. 1, PageID.18   Filed 06/23/21   Page 18 of 23

65.   Plaintiffs are African American and they were subjected to a stop, seizure and search because of their racial identity.

66.   Defendant A's decision to stop the Plaintiffs was not based on observed improper or illegal conduct. Defendant A did not commence pursuit of Plaintiffs until he was able to observe Plaintiff Sankofa's face during a U-turn. After apprehending Plaintiffs, Defendant A's first comment was about Plaintiff Sankofa's African headwear rather than about any supposed infraction or other misconduct.

67.   In response to Plaintiff Sankofa's insistence that Plaintiffs were not connected in any way to illegal narcotics, Defendant A expressed disbelief consistent with racial stereotypes about African Americans' involvement with drugs.

68.   Defendants Rose, Birmingham and Kusch detained Plaintiffs for an exceptionally long period of time notwithstanding a fruitless search of Plaintiffs' vehicle as well as the absence of any evidence of criminal conduct. Defendants' actions were consistent with those of law enforcement officers who in reliance on racial stereotypes about the inherent criminality of people of African ancestry, believe that contraband will eventually be discovered during an extended search of Black persons.

69.   Defendants' actions were motivated by evil motive or intent and/or involved reckless or callous indifference to the Plaintiffs' rights. Specifically, Defendants willfully and/or maliciously engaged in unconstitutional racial profiling.

18

70.   The effect of Defendants' actions was racial discrimination against Plaintiffs in that drivers of other races who, like Plaintiffs, were lawfully operating their motor vehicles, were not stopped and detained in the same way and for the same reasons as Plaintiffs.

## COUNT III

**CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF AGAINST DEFENDANT GASPER**

(42 U.S.C. § 1983 Violation of the Fourteenth Amendment – Equal Protection (Failure to Train))

71.   Plaintiffs incorporate here all previously stated allegations.

72.   Defendant Gasper is the Director of the Michigan State Police, and as such he is responsible for ensuring that Defendants and all persons employed by the agency as "troopers" are properly trained to comply with constitutional requirements.

73.   Defendant Gasper has been provided with substantial evidence of likely unconstitutional racial profiling by Michigan State Police employees. A documented history and pattern of conduct by these troopers effectively placed Defendant Gasper on notice of the need for new or improved training for Michigan State Police personnel to prevent unconstitutional racial profiling practices.

74.   Defendant Gasper was also provided with information about how to scientifically identify the nature and extent of any unconstitutional racial profiling

practices by engaging an independent expert to investigate and analyze the practices and policies of the Michigan State Police.

75.  Upon information and belief Defendant Gasper failed to obtain an independent expert analysis necessary for the development of training that effectively prepares troopers to engage in law enforcement activities without engaging in unconstitutional racial profiling.

76.  In the face of acknowledged evidence of widespread and ongoing racial disparities in traffic stops, Defendant Gasper demonstrated not only a deliberate indifference to the rights of persons who are targeted by unconstitutional racial profiling, but he also intentionally failed to take recommended actions to prevent discriminatory practices by his subordinates.

77.  Because Michigan State Police personnel have demonstrated a pattern of conduct that is likely to be, or have the effect of, unconstitutional racial profiling, and Defendant Gasper has failed and continues to fail to effectively investigate trooper practices and provide training tailored to the conditions present in the agency, Plaintiffs are likely, if not certain to become targeted yet again by troopers engaging in racial profiling practices that violate the constitutional rights of Plaintiffs by discriminating against them because of their race and thereby violating their rights to equal protection under the Fourteenth Amendment. As a direct consequence of this ongoing threat to their constitutional rights, Plaintiffs have

significantly limited and otherwise modified their driving practices to avoid racial profiling, and they have suffered and continue to suffer trauma whenever they are in the actual or perceived proximity of Michigan State Police troopers.

78.   Plaintiffs' injuries will continue unless the discriminatory practices of the Michigan State Police are prospectively enjoined through the intervention of experts to identify and correct the agency's unconstitutional practices.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

a.   For a declaration that Defendants' actions, policies, and practices as alleged herein are unlawful;

b.   For compensatory damages for Plaintiffs' injuries and losses in an amount to be proven at trial;

c.   For an order enjoining Defendants from engaging in the unlawful acts complained of herein, including a specific requirement that  Defendant Gasper  engage independent experts to conduct a transparent analysis of the practices of MSP personnel, along with existing agency data and policies for the purpose of identifying the causes of racially disparate treatment and impact and the measures required to eliminate racial disparities, and also requiring Defendant Gasper to comply with measures prescribed by experts and thereafter engage in ongoing

annual racial data collection and public reporting.

d.  Punitive damages;

e.  For attorneys' fees and costs of suit pursuant to 42 U.S.C. § 1988 and

other applicable authority; and

f.  For such other and further relief as this Court deems just and proper.

Respectfully submitted,

/s/ Mark P. Fancher
Mark P. Fancher (P56223)
Daniel S. Korobkin (P72842)
American Civil Liberties Union
   Fund of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6822
mfancher@aclumich.org
dkorobkin@aclumich.org
*Counsel for Plaintiffs*

Nakisha N. Chaney (P65066)
Cooperating Attorney,
American Civil Liberties Union
   Fund of Michigan
Salvatore Prescott Porter & Porter
105 E. Main St.
Northville, MI 48167
(248) 679-8711
chaney@spplaw.com
*Counsel for Plaintiffs*

Dated: June 23, 2021

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a trial by jury in the above-captioned matter.

Respectfully submitted,

/s/ Mark P. Fancher
Mark P. Fancher (P56223)
Daniel S. Korobkin (P72842)
American Civil Liberties Union
   Fund of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6822
*Counsel for Plaintiffs*

Nakisha N. Chaney (P65066)
Cooperating Attorney,
American Civil Liberties Union
   Fund of Michigan
Salvatore Prescott Porter & Porter
105 E. Main St.
Northville, MI 48167
(248) 679-8711
chaney@sppplaw.com
*Counsel for Plaintiffs*

Dated: June 23, 2021